HELEN COLGAN *vs.* UNITED ELECTRIC RAILWAYS COMPANY.

MAY 24, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

CAPOTOSTO, J.   This is an action of trespass on the case
for negligence brought by the plaintiff for injuries received
while boarding an electric car operated by the defendant.
The accident occurred about midnight of October 21, 1935,
on Cranston street in Oaklawn, Cranston.   After a jury trial
and a verdict for the plaintiff in the sum of $13,250, the de-
fendant's motion for a new trial was denied and the case
is here on defendant's bill of exceptions.

The specific questions raised by the exceptions, upon
which the defendant relies, are as follows: Did the trial jus-
tice err (1) in denying defendant's motion for a direction
of verdict; (2) in denying defendant's motion for a new
trial on the usual grounds and the further ground that the
damages are excessive; and (3) in admitting or excluding
certain evidence in the course of the trial?

The car in question was inbound from Oaklawn to Provi-
dence.   According to the direction in which the car was
proceeding, the car tracks at the place of the accident are
located on the right-hand side of Cranston street, and there
is practically no sidewalk to the right of those tracks.   It
is admitted that it was a clear and pleasant night; that the
car was stopped for the purpose of allowing the plaintiff
and a friend, Evelyn G. Pomfret, now Mrs. Benson, to board
the car; that at that time they were standing in the street

to the left of the tracks; that the two folding doors on the left of the front vestibule were opened to receive them as passengers, and that they proceeded to board the car through those doors.

On the outside of this one-man car, so-called, there is a folding step which leads to the platform of the front vestibule. This step is connected with the doors in such a way that it is automatically lowered or raised with the opening or closing of the doors. Each door is in two sections. When they are opened, the sections of the rear door fold up against the body of the car and those of the front door fold up against the forward end of the vestibule. When the doors are closed, they come together near the edge of the platform and parallel to it. The construction of the edges of the doors, where they come together when closed, is the subject of conflicting evidence. The doors and outside step operate by air pressure.

On the platform of the vestibule, midway between and about four inches inside of the doors, there is an iron stanchion. The outer edge of the operator's seat is two feet, seven inches from the edge of the platform. The doors are opened or closed by means of a horizontal valve handle which operates within the length of a minor arc, the limits of which are fixed when the operator assumes control of the car. The operator moves this handle by hand within that arc. The handle is located in the extreme front left corner of the vestibule, at an angle of approximately forty-five degrees in front of and to the left of the operator. On car number 2182, which is the one involved in this accident, the handle was moved by the operator towards him, or "clockwise", to close the doors, and away from him, or "counter-clockwise", to open them. The controller box and the various levers used in starting or stopping the car are located directly in front of the operator, while the coin box, where a passenger deposits his fare, is near the operator and to his right.

The parties agree that the car cannot be started while the doors are fully open, as the electric contact is broken and the power cannot be applied when they are in that position. One of the main points in dispute in this case is how nearly closed the doors must be in order to make it possible to start the car. The defendant contends that the doors must be completely closed or "practically" so before the car can be started. The plaintiff, on the other hand, contends that the mechanism controlling the doors can be so adjusted that the necessary electric contact will be made and the car started when the edges of the closing doors are three inches or more from each other. We will later refer to the conflicting testimony on this point and other such testimony with relation to the character of the edges of the doors.

On the question of defendant's liability, the plaintiff's claim in general terms is that, while she was boarding the car her right ankle was caught between the closing doors and was severely injured as a result of the operator then starting the car without warning. The defendant does not attempt to explain the cause of plaintiff's injury. Its defense to her claim is that the accident could not have happened in the manner testified to by the plaintiff as the car could not be started until the doors were closed, or so nearly closed that it was impossible for the plaintiff's ankle to be struck by the edges of the closing doors. The testimony on this point is, therefore, in serious conflict.

In reviewing the testimony now before us, we will confine ourselves to the situations immediately preceding and following the accident, as our previous opinion in this same case substantially sets forth the testimony on points of lesser importance. For such testimony, reference is therefore made to the case of *Colgan* v. *United Electric Rys. Co.,* 62 R. I. 184, 4 A. 2d. 258.

The plaintiff testified that she started to board the car to her left of the iron stanchion, as Miss Pomfret was boarding the car to the right thereof. Her testimony, in substance, is that, with her left foot on the platform of the vestibule and her right foot on the step outside and while she was holding the stanchion with her right hand, she leaned forward to raise herself to the vestibule platform; that as she was proceeding to enter the vestibule from this position, she, with her left hand, gave the operator a dollar bill, which she had previously taken from her pocketbook, to pay the fares for herself and Miss Pomfret; that she then continued to board the car, and that as she was "dragging" her "right foot in" to place it on the platform of the vestibule, she felt "something" strike her ankle and the car started, throwing her to the floor of the vestibule and rendering her unconscious. She was in the hospital when she became conscious.

In its brief and argument to us the defendant strongly contends that the electric contact necessary to apply the power and start the car could not possibly be effected while a person is standing with one foot on the step and the other in the vestibule. It argues that in such a situation the person's body would be in the doorway and that this would prevent the doors from completely or almost completely closing, which must be the case before the necessary electrical contact is made to start the car. It also argues that the outside step and the doors will not move with a weight of about fifty pounds on that step. The plaintiff weighed about one hundred and eighty pounds.

We have scrutinized the plaintiff's testimony with reference to the position of her right foot and body when she claims that her ankle was injured by the closing of the doors. In her entire examination she repeatedly testified that: "I was about to drag my foot in . . . I was dragging my right foot in. . . . I was just about to drag it in on the vestibule.

. . . I was pulling my right foot in" when she felt "something" strike her ankle and the car start up. She further testified that she was "leaning forward" with her body "inside the vestibule" when she was dragging her right foot onto the platform. "Q. In relation to the line of the doors of the car, where was your body at the time you felt this blow or this striking? A. Inside the vestibule. Q. Well could you describe that to the jury in plainer language perhaps than I have been able to use, Miss Colgan, the operation of your getting into the car? A. Well I was, my body was in the vestibule and I was about to drag my right foot in to place it on the vestibule." We will consider later the effect of this testimony on the defendant's above-mentioned .contention.

Except as hereinafter indicated, we need not refer to the testimony of the following witnesses, unless pertinent, as it is essentially the same as their testimony in the first trial and is substantially set forth in our previous opinion in this case, reference to which has already been made. These witnesses are Evelyn Pomfret, the plaintiff's companion; Robert J. Murray, the operator of the car; Ralph F. Banks, the only passenger in the car at the time of the accident; Robert L. Chilton, the foreman of defendant's repair shop; and Walter L. Anthony, an engineer called by the defendant.

The defendant claims that it does not know how the accident happened. In denying liability, it relies on two main points: First, the testimony of the operator that, when he started the car, the doors were completely closed, with the plaintiff standing close to him on the platform of the vestibule; and second, the testimony of its operator, foreman and engineer to the effect that the power necessary to start car number 2182, which was the car involved in this accident, could not be applied unless the doors were completely or almost completely closed. The inference sought to be established by the testimony on the second point is that it

would be impossible to establish the electric contact necessary to apply the power and start the car with the plaintiff's ankle between the edges of the two doors.

We deem it advisable to refer to the testimony of the defendant's witnesses on its second point, especially since the plaintiff introduced expert testimony in rebuttal with relation to the closing of the doors and the starting of the car, which was not in evidence in the first trial of this case. Robert J. Murray, the operator, testified in direct examination that the doors would have to be "practically closed" to start the car. In cross-examination he testified as follows: "Q. But is it your contention that if a woman's ankle were inserted between the doors of the car, or between the vestibule and the doors, that that would prevent the contact being established? A. I could not say just how that is. Q. And, of course, it would be possible for the doors of the car to close upon the ankle of a person as she was bringing her foot into the car? A. It would. Q. And you are not in a position to tell us how large an object it would be necessary to put between the doors in order to prevent the contact? A. Not absolutely; no sir."

Robert L. Chilton, the foreman of the repair shop, testified that a weight of forty or fifty pounds on the outside step would prevent the doors from closing, but that if a person put "his foot on the platform that raises the other foot off the step, naturally the doors would close." His testimony as to the closing of the doors before establishing the electric contact necessary to apply the power and start the car differs in the course of his examination. In direct and redirect examination he testified that the doors would not have to be "absolutely" closed to establish contact, and that it would be established when "the edges of the door would be within 1 inch or 1½ inches of being closed." In cross-examination he testified as follows: "Q. If an object about 3 inches in diameter was caught in there (between

the closing doors) why you still could make the contact, couldn't you? A. Yes. Q. The answer is yes? A. Yes."

Walter L. Anthony, the defendant's engineer, testified as follows in direct examination: "Q. With the doors open and the step down is it possible to start up the car? A. It is impossible to start that car with the doors open. . . . Q. Just what position would these doors have to be in, as far as being opened or closed, so that the circuit would be open and the operator would have power to apply? A. The front ends of the doors would be right at the stirrup at the bottom of the car, just entering that car, and they would probably be, I would say, 5 inches or 4 inches apart. The Court: Just what do you mean by that? You mean, the edges of the doors? Witness: Yes." The court adjourned for the noon recess at the end of this direct examination.

When the court reconvened, the plaintiff's attorney waived cross-examination. Counsel for the defendant thereupon again questioned the witness, who then explained that "there is a rubber cushion on each face of the doors", somewhat less than an inch thick, and that, allowing for these cushions, "The doors would be closed within 2 inches" of the outer edge of the platform and "parallel to the edge of the platform." He further testified that the contact necessary to open or close the doors was controlled by an *adjustable* electric switch which is attached to the "air engine", apparently meaning the compressed air mechanism that moves the doors. He closed his answer saying: "There may be some cases the doors will be absolutely closed before that contact will be made."

We quote in full the cross-examination that followed. "Q. And in other cases they (the doors) may be 4 inches, or 5 or 6 inches, before the contact is made? A. I don't think you could make that variation. Q. You say it is adjustable? A. To a certain extent. Q. And you did tell Judge Curry that when the doors got within 4 inches of closing the con-

tact was established? A. Well I don't know. Well I would say now within 4 inches of the doors, but not the buffers."

Armand L. Cloutier, an engineer called in rebuttal by the plaintiff, testified that the electric contact switch controlling the doors is adjustable, so that "contact will be established when the doors are at different points." He expressed the opinion that this switch could be so set that the necessary contact to operate the car would be formed when the doors were 4 or 5 inches apart, or when they were only 1 or 2 inches apart. At the request of plaintiff's counsel, he measured the plaintiff's left or uninjured ankle and found it to be 3 inches in diameter.

Car number 2182 was apparently examined by this witness in the presence of counsel for both parties and of Chilton, the defendant's foreman, at some undetermined time before the second trial of this case, which opened on May 30, 1939. In cross-examination Cloutier admitted that the car could not be operated with his foot between the doors, as the necessary electric contact was not made while the doors remained 3 or 4 inches apart. However, in redirect examination, he testified that, after adjusting the electric contact switch with the defendant's permission, he "wasn't allowed to close the door." His opinion was that when he examined the car its "mechanism" was so set that the contact would not be established until the doors were practically closed. Other than that the car was in good operating condition, there is no testimony from the defendant as to whether, at the time of Cloutier's examination, the electric contact switch was set the same as it was when the accident happened, on October 21, 1935.

Doctor John Vallone, who first saw the plaintiff, testified that he found a clean cut or incised wound across and on the inside of her right ankle, with a compound fracture of the bone at that point. He expressed the opin-

ion that such cut resulted from the application of some outside or direct force to the ankle. Having in mind the plaintiff's position in boarding the car and her testimony that her ankle was struck by something as she was "dragging her right foot on to the platform", the inside of her right ankle would be opposite to the edge of the door which was attached to the front end of the car. This situation causes us to revert to the testimony with relation to the construction of the edges of the doors.

We have already stated that Anthony, the defendant's engineer, testified that there was a rubber cushion, less than an inch thick, on the edge of each door. The testimony of Chilton, the shop foreman, is to the same effect except that, according to him, there is apparently no rubber tubing at the bottom edge of the door. "Q. As the bottom of the door comes into the vestibule it is just wood? A. Just wood." Armand L. Cloutier, the plaintiff's engineer, testified that while there was a rubber tubing on the edge of the door next to the body of the car, there was no such tubing on the edge of the door that was attached to the front end of the car, which edge was just "plain wood". It is the edge of this door that would be opposite the inside of the plaintiff's right ankle in the position that she was in, according to her testimony, when the inside of that ankle was injured.

We agree with the defendant that it is not possible to rest a case on mere speculation and to presume the existence of negligence on the part of a defendant merely because of injury to a plaintiff. In the instant case, the defendant, in substance, argues that since there is no direct testimony of the operator's negligence there is therefore no evidence of negligence on its part to justify recovery by the plaintiff. No authority has been cited to us in support of this extreme view, with which we do not agree. The defendant's negligence may be established by indirect

and circumstantial as well as by direct evidence, provided that all the evidence, taken as a whole, presents sufficient facts and circumstances from which such negligence may be fairly and reasonably inferred. This point was considered and decided by us in *Vrooman* v. *The Shepard Co.*, 57 R. I. 445.

When the testimony in this case is analyzed and considered as a whole, it is evident that, as to the defendant's negligence, it may reasonably lead to different conclusions. Since we have set forth in considerable detail the pertinent and conflicting testimony of the parties on that question, no further discussion of such testimony is necessary. The defendant suggests in argument that the plaintiff fell from some unknown cause while she was on the platform of the vestibule and after the doors had been closed by the operator; and that, in falling, her hand in some way came in contact with the valve handle that operates the doors and caused them to open. The operator did not so testify and we find no support whatever in the evidence for such a suggestion.

The evidence in the instant case does not establish, as the only reasonable inferences to be drawn therefrom, the premises which the defendant adopts and uses as the bases for its conclusion, heretofore stated, that there was no negligence on the part of its operator in closing the doors and starting the car. The doors being admittedly in the exclusive control of the defendant's operator, the evidence is also reasonably open to the conclusion for which the plaintiff contends, namely, that the doors were operated after the plaintiff had raised her weight from the step of the car and that the electric contact was established and the car started while the plaintiff, with her body inside the vestibule of the car, was pulling her right foot through whatever opening remained between the edges of the doors as they were in the act of closing completely. Under our well-established rule it would have been error for the trial

justice to direct a verdict for the defendant in this state of the evidence. *Pizza* v. *O'Malley*, 59 R. I. 298; *Vrooman* v. *The Shepard Co., supra.*

In urging the exception to the denial of its motion for a new trial, the defendant argues in effect that the trial justice misconceived the evidence as to the defendant's negligence. Its position is stated as follows in its brief: "There was not even a scintilla of proof that the defendant was guilty of the negligence alleged in the plaintiff's declaration. Any inference of negligence on the part of the defendant which might be properly or improperly drawn is contrary to the great and overwhelming preponderance of the credible testimony."

This contention, as in the case of its motion for a directed verdict, is apparently based upon the assumption that the only credible evidence, with relation to the accident itself and as to the construction, adjustment and operation of the mechanism controlling the opening or closing of the doors of the car, came solely from the defendant's witnesses and is, therefore, undisputed. We cannot agree with any such contention. There are various instances in the testimony for the defendant which are reasonably open to different conclusions, according to the credibility that might be attached thereto by equally honest and fair-minded men. Furthermore, there is nothing inherently improbable in the testimony of the plaintiff, nor does it appear that she or her witnesses are unworthy of belief. In the circumstances, it was a question of fact, depending upon the credibility that might be given by the jury to the testimony of any witness or set of witnesses, whether the operator of the car negligently closed the doors of the car in the manner and at the time claimed by the plaintiff.

The credibility of the witnesses was a material element in determining the weight of the evidence in reference to the defendant's negligence. Both the jury and the trial

justice, who had the advantage of seeing and hearing the witnesses, have decided this issue in favor of the plaintiff. In passing on a motion for a new trial, it is the duty of the trial justice to weigh the evidence and pass upon the credibility of the witnesses in the exercise of his independent and more comprehensive judgment. *Barlik* v. *United Electric Rys. Co.*, 60 R. I. 227. From our examination of the transcript and rescript, we cannot say that the trial justice was clearly wrong in denying the defendant's motion for a new trial in so far as such motion relates to the issue of defendant's liability.

The second ground in defendant's motion for a new trial is that the damages are excessive. The defendant concedes that plaintiff suffered a painful injury with resulting permanent disability commonly known as a "club foot", but contends, among other things, that the extent of that disability and her future suffering therefrom could have been greatly diminished if the plaintiff saw fit to follow the advice of Dr. William A. Horan, an orthopedic surgeon, who testified as a witness in her behalf.

It appears in evidence that several operations and prolonged hospitalization were necessary in treating the plaintiff's injury, which was aggravated by a septic condition of the wound. Doctor Horan, orthopedic surgeon-in-chief at the hospital where the plaintiff was a patient, ultimately performed all necessary major operations, while Dr. Thomas H. Murphy attended to other medical matters in connection with the plaintiff's treatment during the time that Dr. Horan was in charge of the case. Doctor Murphy took care of the plaintiff following her discharge from the hospital, in March 1936, up to the trial of the instant case on May 30, 1939. His bill was $750. Doctor Horan's bill was $251.70.

It is clear from the evidence that the plaintiff has a permanent injury of a substantial character. Whether the

extent of her future disability resulting from such injury could be diminished by an operation is a matter of medical opinion. Doctor Horan, in answer to questions from the defendant, testified that the plaintiff "still could be helped to a considerable extent by an operation", so that she might reasonably be expected to walk without crutches or iron brace on her foot. Doctor Murphy, who was not questioned on this point, expressed no opinion with relation thereto. In his charge the trial justice referred generally to matters that the jury could consider on the question of damages for future disability, but he gave them no specific instruction as to when it becomes the duty of an injured person to submit to an operation or suffer the risk of having his recoverable damages diminished. See *Cero* v. *Oynesando,* 48 R. I. 316; *O'Donnell* v. *Rhode Island Co.,* 28 R. I. 245. The defendant presented no requests to charge on this point, and it took no exception to the charge as given. In the circumstances, the law as stated by the trial justice in his charge became the law of the case. *Agras* v. *State Board of Public Roads,* 56 R. I. 163.

However, the record does show that, in reviewing the evidence bearing on the defendant's claim that the damages are excessive, the trial justice misconceived and gave undue weight to the testimony of Dr. Murphy in its relation to plaintiff's future disability. Clearly referring to the testimony of Doctors Murphy and Horan, he says in his rescript: "In the opinion of one of the doctors it will not be possible to correct the deformity of her foot. In the opinion of another doctor the deformity may be corrected by another operation." We find no such conflict in the testimony of these doctors.

The plaintiff, who is about thirty-nine years old and apparently in good health, incurred a total bill for hospital charges, medical fees and other incidental expenses of about $1800. There was no actual loss of wages, as the plaintiff

kept house for her father, who gave her from $3 to $5 a week as "spending money". On all the evidence before us, we are of the opinion that the damages are clearly excessive and that the sum of $10,000 will fairly compensate the plaintiff without injustice to the defendant. The defendant's exception to the denial of its motion for a new trial on the ground of excessive damages is sustained.

All other exceptions of the defendant have been considered and found to be without merit. They are overruled.

The case is remitted to the superior court for a new trial on all issues, unless the plaintiff shall file, on or before June 10, 1940, in the office of the clerk of the superior court, a remittitur of all of the verdict in excess of $10,000. If the plaintiff shall file such remittitur, the superior court is directed to enter judgment on the verdict as reduced by the remittitur.

*Quinn and Quinn, Michael DeCiantis,* for plaintiff.

*Clifford Whipple, Earl A. Sweeney,* for defendant.